**RECTOR et al. v. DU VAL et al.**

POSSESSORY TITLE—*Determined by weight of evidence.*—Where, under the plead-
ings, possession of land is the matter in issue, and each party claims the
benefit of limitation upon a possessory title, the rights of the parties will be
determined by the evidence.

APPEAL FROM PULASKI CHANCERY COURT.

HON. T. D. W. YONLEY, *Chancellor.*

*Gallagher & Newton and J. M. Smith,* for Appellants.

That the deed from Field to Rapley, and mortgage from
Rapley to the Bank was not intended, and did not pass the
title out of Field—and for construction of these deeds. *See
Guthrie vs. Field,* 21 *Ark. Rep.,* 385, *and Trapnall et al. vs. Ben-
ton et al.,* 24 *Ark.,* 389, *and this last case is applicable to the pres-
ent one throughout.* That possession gave Field title, and limi-
tation would bar Rapley and his heirs as to deed of 1837. *See
Hinton vs. Fox,* 3 *Litt.,* 380; *Hanie vs. Hall,* 5 *Hemp.,* 290; 6
*J. J. Marsh,* 536; *Hide vs. Hide,* 1 *B. Mon.,* 177; *Trapnall et
al. vs. Benton et al.,* 24 *Ark.,* 384, *et seq.* That the recitals in
the mortgage deed concluded Rapley and all claiming under
him, and that he is estopped thereby. *See Sayles vs. Smith,*
12 *Wend.,* 58; 12 *Ill. R.,* 357; *Bush vs. Marshall,* 6 *Hump.,* 284;
*Jerry vs. Bank of Orleans,* 9 *Page C. R.,* 649. That the deed
of 1837 was not to Rapley in trust. *See Clogett vs. Hall,* 9
*Gill & J.,* 80; *Dickerson vs. Dickerson,* 2 *Minn.,* 279; *Steen vs.
Steen,* 5 *John. Ch. cases, and Gould's Dig.,* Statute of Frauds,
Sec. 12.

2d.    That the Borden deed did not affect the lands in con-
troversy, is defective and void, and the onus of showing regu-
larity is on the party claiming thereunder. *See Lafferty vs.
Cowen,* 3 *Sneed, (Tenn.)* 221–231; *Hobart vs. Frisbee,* 5 *Cowen,*
592; *Clemens vs. Runnells,* 34 *Miss.,* 579.

That the court of equity, in this case, on bill for partition
and general relief, or even for partition alone, has full power

to settle the rights of all the parties. *See Trapnall et al. vs. Benton et al.*, 24 *Ark.*, 401 ; *Ashley et al. vs. Rector et al.*, 20 *Ark.*, 359 ; *Blakeny et al. vs. Ferguson et al.*, 20 *Ark.*, 547 ; *Drennen, Adm'r, et al. vs. Walker et al.*, 21 *Ark.*, 539.

*U. M. Rose and Clark & Williams*, for Appellees.

Though the recital of consideration in a deed may be explained by parol testimony, yet this cannot be done for the purpose of defeating the conveyance: *Vaugine vs. Taylor*, 18 *Ark.*, 65.

And no parol condition, reservation or defeasance can be proved to defeat the grant. *Rogers vs. Sebastian County*, 21 *Ark.*, 440.

As to possession by Field after conveyance, unless the possession was clearly shown to be hostile, he would be held to occupy in right of his vendee, and the statute of limitation would not run. *Jackson vs. Thomas,* 16 *J. R.*, 292; *Floyd vs. Mintsey*, 7 *Rich*, 181.

As to cutting of wood on the land, the possession of the father was the possession of the son, and cannot be disturbed so that it shall enure to himself. *Danley vs. Rector*, 10 *Ark.*, 211; *Dodd vs. McCraw*, 8 *Id.*, 83; *Prater vs. Frazier*, 11 *Id.*, 249; *Rector vs. Danley*, 14 *Id.*, 304.

To defeat the deed of 1837, it is shown that Field afterwards mortgaged the same lands with much other property, real and personal, to Rapley and Johnson, and Rapley and Rector. But this proves nothing, since the acceptance of these mortgages would not divest the title of Rapley as by estoppel. This is well settled. *Harding vs. Springer*, 2 *Shipley* 407; *Ham vs. Ham, Id.*, 351; *Housatonic Bank v. Martin*, 1 *Metc. (Mass.)* 294; *Parker vs. Locks and Canals*, 3 *Id.* 91. A grantee may show that his grantor had no title. That is done every day. *Gaunt vs. Wainman*, 3 *Bing., N. C.* 69 ; *Small vs. Proctor*, 15 *Mass.*, 499; *Averill vs. Wilson*, 4 *Barb.* 10 ; *Sparrow vs. Kingman*, 1 *N. Y.*, 242; *Gardner vs. Green*, 5 *R. I.* 104. If the mistake in the deed of Borden was mutual, the deed

was not void. *Hill vs. Bush*, 19 *Ark.*, 522; *Byers vs. Fowler*, 14 *Id.* 86; but if void, it would still be admissible to explain the holding, and make good a title by limitation. *Cofer vs. Brooks*, 20 *Ark.*, 542. Any claim by Field was clearly barred by *Sections* 1, 2 *and* 5, *Chapter* 106, *Gould's Digest*.

GREGG, J.—The minor heirs of Jane E. Rector, by their guardian, Henry M. Rector, brought their bill of complaint, in the Pulaski Chancery Court, against DuVal and wife, and others, who, with themselves, are alleged to be heirs at law of William Field, deceased, and prayed a decree settling the rights of the parties, and for partition of the north part of the east half of the south east quarter of section ten, and the north part of the south-west fractional quarter of section eleven, in township one north, of range twelve west, and certain lots in the city of Little Rock, of which, it is alleged, Field died seized and possessed.

The complainants do not set out the title of Field. The defendants admit the ownership of the city lots, as charged in the bill, and that, in 1837, Field was seized in fee of the lands described; but they charge that on the 25th of August, of that year, he and his wife Mildred, by deed absolute, conveyed said lands to Charles Rapley, who took possession of the same, and that, thereafter, they remained in his possession until 1848, when they were levied upon and sold to satisfy certain judgments and executions against said Field and Rapley; that, upon such sale, the lands were bought in by F. W. Trapnall, and at his written request, by Borden, the sheriff, deeded to said Rapley, in trust for the use of Ann B. Rapley (trustee's wife), DuVal and wife, in right of the wife, and Ben. Johnson Field, with power in the trustee to make division; and that partition was agreed upon and made by said Rapley, DuVal and William Field, the father of Ben. J. Field, who was then a minor living with his father, and that from the year 1848, the said trustee and beneficiaries held and controled said lands; that, by a clerical misprision, said lands were

misdescribed in said trust deed; that William Field had control of and cut wood on his minor son's share up to within a few years of his death, which took place in 1861.

The complainants admitted the execution, in due form, of the deed of August 25, 1837; but they alleged that that deed was made without consideration, other than as security for Rapley to mortgage the lands to the Real Estate Bank, upon which he could borrow money, and that the title and possession were to be and remain in Maj. Wm. Field for all purposes, except so far as the same might be affected by such mortgage; that said Field did remain in possession thereof, (except about twenty or thirty acres, alleged to have been afterwards sold to Rapley), and that in 1843 and 1844, Field mortgaged the same, and did other acts of ownership up to or near the time of his death, and that complainants knew nothing of said sheriff's deed until since the war.

The substance of the proof was to the following effect:

Brown testified that he knew the land; heard it stated in the family that Maj. Field had given some of that land to Ann B. Rapley, some to Ben. J. Field, and some to Judith Ellen DuVal; that Mrs. Rapley and her husband were in possession of their part in 1841, but the other was, at that time, in Maj. William Field's possession; he claimed it and cut wood off of it; afterwards, DuVal got wood off of part of it; none of it was ever fenced except part of Rapley's, etc.

Danley says that in 1848, and since, he saw William Field's slaves getting wood on the lands.

Scott testified he had resided here twenty-nine years; was formerly a slave of William Field; that he knew when the defendant, DuVal, was married; that Field claimed that land, and that about a year after DuVal's marriage, he and Wm. Field, and his son Ben. Johnson Field, went on the land and measured off some on the south side for Mrs. Rapley, and then divided the balance of the land by running a line north and south, through the center of the tract, and DuVal got

the north-west part of the tract, and Ben. J. Field the north-east part, and Mrs. Rapley the south part; that, after that time, DuVal had possession and got wood off of his part, and Maj. Field got wood, up to 1860, off of Ben. J. Field's part; Ben. was then a minor living with his father. The witness and Ben. J. Field run the same lines over again in 1861; there were no improvements only on Rapley's part, etc.

James Martin testified that he was the administrator of Charles Rapley's estate; he is a surveyor, he knew the lands, gave a description of them, etc.

Henry M. Rector testified that he was son-in-law of Maj. Field, and knew the lands in 1838, and that Field then owned them. He was often over the lands with Maj. Field, up to 1858; that about 1837 Field gave or sold Rapley some lands in the bottom adjoining these, and he thinks about eight or ten years subsequently, Rapley wanted to build, and he understood from the parties, Field sold Rapley some off of the south end of the tracts herein described, which was there-after in Rapley's possession up to 1863; that he always under-stood the lands to be in Maj. Field's possession. But it was often spoken in the family that he designed to give some por-tion of these lands to DuVal and wife, a portion to Ben Field and a portion to Mrs. Rapley, but witness never knew what portion, when or how it was to be given. That DuVal fre-quently said a portion of it was his; Ben Field and Mrs. Rapley also claimed a portion. That Maj. Field always spoke of these lands as his, and he saw Field's hands getting wood east of the center of the tract. Rector further stated, with some detail, the real and personal property by Field given to his different children, and showed that the complainants and their mother had received less than some others; that the estate of Field, at the date of his death, was not worth very many thousand dollars and that, in his opinion, the lands in controversy, in 1848, were worth from five to seven thousand dollars, and that now they are worth from twenty-five to thirty thousand dollars.

Ben. T. DuVal testified that Rapley lived on his lands as early as 1842; that he did not positively know who had the other lands in possession up to 1848, but that soon after the making of the deed from Borden, as sheriff, the south part was by Rapley, Maj. Field and witness, set apart to Mrs. Rapley; the north-west part to witness and wife, and the north-east part to Ben. J. Field.  No measurement was then made, and no one, to his knowledge, made any claim or exercised any acts of ownership over it from 1851 to 1865.  That he had wood cut off of his part, and all that time paid taxes, intended for, and to go on that land, and that Maj. Field paid no taxes thereon after 1848, but there was a mistake in the description on the tax books, as on the Borden deed, until 1862; that after 1848, Maj. Field exercised no acts of ownership over the north-west part, claimed by DuVal; that he went with DuVal on the land and pointed out a site for him to build when he had spoken of building, and also pointed out where the line would run, dividing Ben. Field's lands from DuVal's; that Maj. Field and Rapley both considered that these same lands were conveyed in trust by the Borden deed, and that in 1862, Rapley, as such trustee, conveyed to DuVal and wife the part claimed by them, and that all DuVal's claim and acts of ownership were under the Borden deed of trust and the agreement made in 1848, made between those then interested, in accordance with what was understood to be the Borden deed; that so long as the Major was able to do any business, Ben. J. Field was a minor, living with him, and the Major had control of his lands.

Ben. J. Field testifies that he lived with his father; that after 1848, the father forbid his hands cutting wood on the lands claimed by DuVal, said that belonged to DuVal, etc., and in 1863, Rapley offered to deed witness his part, and said he held his lands in trust, etc.; none of the lands were improved, only a part of Rapley's.

Thomas C. Peek testified that in 1861, Rapley pointed out his north-west corner and said he wanted to give witness' wife,

who was Rapley's daughter, some land near there; this was on the south and joining what, in the families of Field and Rapley, was known as DuVal's land, etc.

Mrs. Ann B. Rapley testified that she was the daughter of William Field, who died in November 1861. Upon marriage, her father set apart to each daughter a portion of land and a slave, or the value of one, and in 1847, when her sister Ellen, married DuVal, the lands herein claimed were intended to be divided; twenty acres, near the Rapley house, to be witness' and the remainder to be equally divided between her brother Ben. and sister Ellen, after witness' share was taken off; the west half was to be Ellen's, and the east half Ben's. After the division of the lands, her father exercised no control over them, only to haul wood off of Ben's and some off of hers, and during that time Ben was a minor, and lived with the father, and was under his control; that she heard the father one time suggest to Ellen that she had better use her wagon, team and servant to haul wood off of her lands, if for no other purpose than to get pocket money, and when Mr. Allis wanted a right of way for a plank road across that land, he referred him to Mr. DuVal as the owner.

Mr. Rapley held these lands in trust for the parties named, and after we were separated in the war, he expressed regret that the deeds had not been made to them respectively. He was then in bad health and wished the matter settled, and after we removed to Camden, he and wife made a deed to DuVal, and she understood that deed to convey the west half of the land referred to, as having been designated for him and Ellen. The ownership of these lands was frequently discussed in the family of Maj. Field, and was never controverted; never heard of any objection until at Camden. Mr. Rapley said Governor Rector would object, but that he would carry out the trust; that her father's agreement for this division was after DuVal's marriage, and that witness' twenty acres were set apart some time after that. That she does not know of any survey being made when the lands were divided

between herself, brother Ben, and sister Ellen; she was never present at any survey, but she walked over the lines dividing and bounding the different tracts with the father many times.

Upon this proof, the court found that William Field did not die seized of the lands in controversy; that there was therefore no equity in the original bill and decreed the same be dismissed and the complainants pay costs, from which the complainants appealed to this court.

William Field's title to the lands in controversy and his conveyance of them to Rapley in 1837, is not questioned; and from the evidence, there seems to be but little doubt, for sometime after this, Field was assuming to own and control most of these lands, at least such of them as were not in Rapley's possession.

The deed made by Borden, as sheriff, in 1848, to Rapley as trustee, seems not to be controverted, only by the complainants, through their guardian denying any knowledge of it; but as the lands in controversy are not properly described therein, the burden is thrown upon the defendants, if necessary for them to maintain title under that deed.

The possession of the land is a matter in issue under the pleadings, and each party claims the benefit of limitation upon a possessory title.

It being admitted that Major William Field, in 1837, was seized and possessed of all these lands, it is then shown by deed that he conveyed them to Charles Rapley; here ends the possession by deed. With this proof alone the complainants could not hope to recover, but to sustain their case they enter upon a wider field, and attempt to show, by parol, that Major Field executed that deed as a security merely, and that he continued the owner and in possession of the land. They show that Rapley mortgaged the land, and produced unwritten proof that conduced to show that Field held possession of the lands. But the ground of establishing title by parol evidence was readily occupied by the defendants, and while the complainants proved by some witnesses that

Field claimed the lands and cut wood thereon, they showed that the lands were principally uninclosed and wild, and that so much as was inclosed was held adversely by Rapley, and the defendants proved by a greater number of witnesses, and by those most intimate with Major Field and family that, subsequent to 1848, he did not claim the lands as his own, and to say the least of the evidence, it tended to show that by his connivance and consent, if not procurement, these lands were deeded to Rapley in trust for his wife, DuVal and Ben Field, with a mistake in description. Leaving this deed out of view, if it was competent for the plaintiffs to show seizen in Field by parol, it was equally competent for the defendants to rebut that showing by like proof, which they certainly did.

To show that the title was not in Rapley, under the deed of 1837, the plaintiffs refer to the fact that though the executions, under which the sale and deed of 1848 were made, were, in part, against both Rapley and Field, that deed only transferred Field's interest in the lands. If this is worth anything as an argument, it proves too much, because the deed of 1848 does not convey the lands, as described in the deed from Field to Rapley, or in this suit, and if the plaintiffs admit that it was a conveyance of the same land, but a mistake in description, that at once defeats their claim.

Rapley's long possession is conceded; but if he took no title under the deed of 1837, under the plaintiffs' assumption Rapley had no title under the deed of 1848. Then as to those lands not in actual possession, he only claimed them, cut wood, etc., and the proof showed as much on DuVal's claim, and if this give title to Rapley by adverse holding and limitation, it just as effectually secured DuVal in the part he claimed. What is admitted for the one is proved for the other.

Now, if it be conceded that the defendants did not sufficiently show a levy, sale and conveyance of these lands in 1848, there is still no written evidence of title in William Field, and the weight of parol evidence is certainly against seizen in him, at the time of his death.

And the complainants cannot ask to admit unwritten evidence to defeat the conveyance made by Field, without also admitting like evidence to defeat a subsequent title claimed to be in him, and the weight of such evidence herein is easily seen.

Brown, Scott, Ben. Field, DuVal and Mrs. Rapley, all testify that it was known and understood in the family, that these lands, in 1848, passed to Rapley, DuVal and Ben. Field; that Rapley and DuVal exercised certain acts of possession and ownership over their respective shares, and while Major Field obtained firewood off some of the lands, there is no act of his shown inconsistent with the claim of his minor son, Ben., and Governor Rector seems to be the only near relation of Major Field's family who did not know of the division of the tract between the parties claiming, and the parties who did claim title; yet he knew that DuVal claimed some land, and that it was often talked of in the family that the three were to have some portions of the lands, but he was not advised that the lands had been given, marked out or conveyed.

It has been more than twenty years, as testified to, since DuVal assumed ownership and paid taxes for his share. The testimony of the family, and the servants of the family, is strong to show that Major Field, for some reason, (and we must suppose it was one satisfactory to himself) attempted to have the title of those lands settled in the defendants, as members of his family, and, it is sufficient to say, that the proof of title in them is much more conclusive than that going to show title in Major Field at the time of his death.

We, therefore, find no error in the decree of the Chancery Court, and the same is in all things affirmed.